**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**
_____

**THE FORT MILLER COMPANY, INC.,**

                  **Petitioner,**

           **v.**                                             **1:12-CV-681
                                                              (FJS/RFT)**

**AMERICAN TRANSPORT, INC.,**

                  **Respondent.**
_____

| **APPEARANCES** | **OF COUNSEL** |
|---|---|
| **FOX & KOWALEWSKI, LLP**<br>4 Old Route 146<br>Clifton Park, New York 12065<br>Attorneys for Plaintiff | **BRENDAN R. WOLF, ESQ.**<br>**LAURENCE I. FOX, ESQ.** |
| **BENESCH, FRIEDLANDER**<br>**COPLAN & ARONOFF LLP**<br>200 Public Square, Suite 2300<br>Cleveland, Ohio 44114<br>Attorneys for Defendant | **STUART A. LAVEN, JR., ESQ.**<br>**ERIC L. ZALUD, ESQ.**<br>**J. ALLEN JONES, III, ESQ.** |

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Currently before the Court are Petitioner's motion to compel arbitration, *see* Dkt. No. 4, and Respondent's motion for a sixty-day extension of time to respond to Petitioner's motion to compel arbitration, *see* Dkt. No. 7.

On May 11, 2012, the Court held a hearing regarding Respondent's motion for an

extension of time in which to respond to Petitioner's motion to compel arbitration.[1]

At the end of that proceeding, the Court stated that it did not think Respondent had "a legal basis for denying a contract exists based upon the fact that [Petitioner] did not sign that document." However, the Court allowed Respondent the opportunity to "submit any law, just give me the case, I don't need [Respondent's] spin on it, just give me the case law that would support [Respondent's] position on that [issue] . . . ." The Court also provided Respondent with an opportunity "to articulate in writing what issue, material issue of fact [Respondent] maintain[s] exists, which would, as a matter of law, prevent this from bein[g] a contract." The Court noted that, if there were material issues of fact as to whether there was a contract, the Court would consider having a jury trial, but the Court did not see any such issues at the time. Finally, the Court provided Petitioner with time to respond to Respondent's submissions.

On May 21, 2012, Respondent filed supplemental papers in further support of its motion for an extension fo time to respond to Petitioner's motion. *See* Dkt. No. 15. Petitioner filed papers in further opposition to Respondent's motion on May 24, 2012. *See* Dkt. No. 16.

The following constitutes the Court's written resolution of the pending motions.

## II. DISCUSSION

**A.  Respondent's motion to extend its time to respond to Petitioner's motion to compel arbitration**

Respondent argues that, although it "concedes that, in a vacuum, the mere failure to

---

[1] During oral argument, Respondent conceded that, if there was a contract between the parties, that contract did contain an arbitration clause and that the parties would have to arbitrate any dispute that arose under that contract.

execute a contract does not necessarily mean that a contract does not exist, . . . a party's failure to execute a purported agreement can (and should) serve as evidence of a party's intention not to be bound." *See* Dkt. No. 15 at 3 (citing *Ciaramella v. Reader's Digest Association, Inc.*, 131 F.3d 320 (2d Cir. 1997) (in absence of a document executed by both parties, court must consider four factors to determine whether both parties intended to be bound); *Kowalchuk v. Stroup*, 873 N.Y.S.2d 43, 49 (2009) (citing *Flores v. Lower E. Side Serv. Ctr., Inc.*, 795 N.Y.S.2d 491 (2005) (an unsigned contract may be enforceable, "provided there is objective evidence establishing that the parties intended to be bound."))).

Respondent further asserts that, in this case, Petitioner clearly failed to execute the agreement; and, therefore,

> [t]he critical inquiry must focus upon *why* [Petitioner] did not execute the purported agreement. Conveniently, [Petitioner] argues that it intended to be bound because it is attempting to enforce the purported agreement against [Respondent]. However, [Petitioner's] present position merely evidences what [Petitioner] intended at the time it attempted to enforce, not what [Petitioner] intended at the time it elected not to execute the purported agreement.

*See id.*

Respondent contends that if, for some reason of which Respondent is unaware at this time, Petitioner's decision not to execute the document was based on its intention not to be bound or that it had other prospective contractors with whom it was also dealing or that it recognized that the parties needed to finalize open terms, then objective evidence exists that both parties may not have intended to be bound to one another. *See id.* Furthermore, Respondent asserts that "[o]ne fact is for certain: because [Respondent] did not receive an executed copy of the purported agreement from [Petitioner], [Respondent] withdrew its offer on April 21, 2011 on the

-3-

grounds that the offer was never formally accepted." *See id.* at 3-4 (citing Affidavit of David Hartman at ¶¶ 4-5, attached hereto as **EXHIBIT 1**).

Finally, Respondent claims that the Court should give it the chance to ascertain Petitioner's intent at the time the parties were discussing the purported agreement, through discovery, rather than compelling Respondent to accept Petitioner's statement of intent as of the time it attempted to enforce the purported agreement. *See id.* at 4. Respondent claims that Petitioner's first indication that it believed that it was bound to the purported agreement occurred after Respondent withdrew its offer on April 21, 2011. Thus, Respondent asserts that an issue of fact exists as to the parties' intent to be bound or form a contract and that, where such a dispute exists, there is no enforceable contract. *See id.* (citing *Dayton Superior Corp.*, 2011 WL 990300 at *7).

Both of the cases that Respondent cites are clearly distinguishable from the present case and do not support Respondent's argument that there is no enforceable agreement between Petitioner and Respondent.

In *Ciaramella v. Reader's Digest Ass'n, Inc.*, 131 F.3d 320 (2d Cir. 1997), the court noted that it had "articulated four factors to guide the inquiry regarding whether parties intended to be bound by a settlement agreement in the absence of a document executed by both sides." *Id.* at 323 (citing *Winston*, 777 F.2d at 80). These factors are as follows: "(1) whether there has been an express reservation of the right not to be bound in the absence of a signed writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." *Id.* (citing [*Winston*, 777 F.2d at 80]). The court stated

that, although "[n]o single factor is decisive, . . . each provides significant guidance." *Id.* (citation omitted).

Based on an express reservation in the agreement not to be bound until both parties had signed the agreement, as well as language that demonstrated that only the terms of the settlement agreement, and not any preexisting oral pact, would legally bind them, the court concluded that the parties intended to bind themselves only at the point of signature. *See id.* at 324 (relying on paragraph 10 of the agreement which stated that "This Settlement Agreement, and General Release shall not become effective ("the Effective Date") until it is signed by [Plaintiff], [Plaintiff's attorney], and [Defendant]" and the first paragraph after the WHEREAS clause, which read "NOW, THEREFORE, with the intent to be legally bound *hereby*, and in consideration of the mutual promises and covenants contained herein, [Defendant] and [Plaintiff] agree to the terms and conditions *set forth below*: . . .").

Likewise, *Kowalchuk v. Stroup*, 61 A.D.3d 118 (1st Dep't 2009), does not support Respondent's position. In that case, the plaintiffs commenced an arbitration proceeding before the NASD asserting that the Defendant had fraudulently or negligently handled the plaintiffs' accounts and seeking judgment for losses of $832,000. After the arbitration hearing was completed, but before a decision was rendered, the parties agreed on a settlement. When defendant defaulted on the first payment of $125,000 due under the terms of the settlement agreement, the plaintiffs' counsel offered defendant an opportunity to cure the default. When the Defendant did not cure the alleged default, the plaintiffs commenced an action for breach of contract.

The court began its analysis by stating that, "[t]o establish the existence of an enforceable

-5-

agreement, a plaintiff must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound (22 N.Y. Jur. 2d, Contracts § 9). That meeting of the minds must include agreement on all essential terms (*id.* at § 31)." *Id.* at 121. Applying these legal principles to the facts before it, the court concluded that the February 6 e-mail that the plaintiff's counsel had sent established that the defendant had made an offer, including all the essential material terms of that offer, and that the plaintiffs had accepted that offer. *See id.* The court rejected the defendant's argument that he had revoked the offer before the plaintiffs had accepted it relying on the fact that the plaintiffs had not yet signed the formal writing by the time they heard about the NASD award, after which the defendant quickly communicated an intent to revoke the offer. *See id.* at 122.

The court noted that, "[w]hile an offer normally may be revoked at any time prior to acceptance, the moment of acceptance is the moment the contract is created." *Id.* Moreover, "'[a]s a general rule, in order for an acceptance to be effective, it must comply with the terms of the offer and be clear, unambiguous and unequivocal[.]'" *Id.* (quotation omitted). The court concluded that, because "there was nothing unclear, ambiguous, or equivocal about plaintiffs' February 6 e-mail responding to Defendant's offer, it constituted an effective acceptance." *Id.*

The court also rejected the defendant's argument that, "because the formal writing prepared for both parties' signature contained language making reference to it being 'complete and binding' upon signature of all the parties, that writing indicates the parties' intent not to be bound until the point that all parties have signed the document." *Id.* The court acknowledged that "'"[i]t is well settled that, if the parties to an agreement do not intend it to be binding upon them until it is reduced to writing and signed by both of them, they are not bound and may not be

held liable until it has been written out and signed[.]"" *Id.* (quotation omitted). However, the court found that "none of Defendant's correspondence indicated an intent not to be bound until an agreement was executed by both parties." *Id.* at 124. Furthermore, the court held that,

> [e]ven if the e-mails had failed to evidence the existence of a contract, the formal written document signed just by Defendant would have sufficed to establish the existence of the parties' agreement, since "an unsigned contract may be enforceable, provided there is objective evidence establishing that the parties intended to be bound . . . unless, of course, the parties have agreed that their contract will not be binding until executed by both sides."

*Id.* at 125.

In the present case, despite Respondent's argument to the contrary, there is nothing in the record to indicate that Petitioner did not intend to be bound by the contract. The four factors set forth in *Ciaramella* favor a finding that Petitioner's signature on the contract was not necessary to bind the parties. First, there was no express reservation of right not to be bound in the absence of a signed writing. Moreover, the agreement explicitly stated that, "[b]y signing this Agreement [**Respondent**] agrees to be bound by the terms and conditions." Thus, if either party's signature was required, it was Respondent's, and Respondent signed the agreement. Second, Respondent partially performed under the contract by, at the very least, procuring and delivering Certificates of Liability Insurance naming Petitioner as holder and additional insured. Third, this agreement was in writing and is the type of contract that is usually committed to writing. Finally, although Respondent attempts to create an issue of fact as to whether there was a meeting of the minds regarding all the terms of the contract, this is nothing more than a red herring and, as the Court will explain more fully below, is not supported by the record. Therefore, the Court concludes that Respondent has not established that the failure of Petitioner to sign the agreement creates an

issue of fact about whether Petitioner intended to be bound by the terms of the agreement.

Accordingly, the Court denies Respondent's motion to extend its time to respond to Petitioner's motion to compel arbitration.

**B.     Petitioner's motion to compel arbitration**

Respondent argues that issues of fact exist about whether there was a lack of mutual assent or a meeting of the minds as to the material terms fo the parties' purported agreement. *See* Dkt. No. 15 at 4. Specifically, Respondent contends that there are issues of fact that preclude the Court from determining mutual assent or a meeting of the minds as to the material terms of size and scope, project schedule, frequency, and, in turn, price. *See id.* at 5.

To the contrary, Petitioner argues that the parties had agreed to all the material terms, including the parties to the agreement, the scope of the agreement, the duration of the agreement, and the quantity and price. *See* Dkt. No. 16 at 2.

As a preliminary matter, because this case involves interstate commerce, the Federal Arbitration Act and federal substantive law control. *See Matter of Lory Fabrics (Dress Rehearsal, Inc.)*, 78 A.D.2d 262 (1st Dep't 1980). Section 4 of Title 9 of the United States Code provides, in pertinent part, that

> [a] party aggrieved by the alleged . . . refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action . . . of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. . . . The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to

> arbitration in accordance with the terms of the agreement. . . . If
> the making of the arbitration agreement . . . be in issue, the court
> shall proceed summarily to the trial thereof. If no jury trial be
> demanded by the party alleged to be in default, . . . the court shall
> hear and determine such issue. Where such an issue is raised, the
> party alleged to be in default may, . . . on or before the return day
> of the notice of application, demand a jury trial of such issue, and
> upon such demand the court shall make an order referring the issue
> or issues to a jury in the manner provided by the Federal Rules of
> Civil Procedure, or may specially call a jury for that purpose. If
> the jury find that no agreement in writing for arbitration was made
> or that there is no default in proceeding thereunder, the proceeding
> shall be dismissed. If the jury find that an agreement for
> arbitration was made in writing and that there is a default in
> proceeding thereunder, the court shall make an order summarily
> directing the parties to proceed with the arbitration in accordance
> with the terms thereof.

9 U.S.C. § 4.

Section 4 severely limits the court's role in considering motions to compel arbitration. *See Application of Conticommodity Servs. Inc.*, 613 F.2d 1222, 1224 (2d Cir. 1980). "[U]nless the 'making' of the agreement to arbitrate or 'the failure, neglect, or refusal' of one party to arbitrate is in dispute, the court must compel arbitration." *Id.* at 1225; *see also Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.*, 462 F.2d 673, 676 (2d Cir. 1972) (holding that "the question of the very existence of the [contract] which embodies the arbitration agreement is encompassed within the meaning of 'the making of the arbitration agreement'").

To qualify for a judicial determination of [the] issue [of the very existence of a contract], a party must provide 'an unequivocal denial that the agreement had been made, and some evidence to substantiate the denial.'" *PMC, Inc. v. Atomergic Chemetals Corp.*, 844 F. Supp. 177, 181 (S.D.N.Y. 1994) (quotation and other citation omitted). "Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a

matter of law that the parties did or did not enter into such an agreement." *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 54 (3d Cir. 1980). When the court is considering a motion to compel arbitration which the party sought to be bound opposes on the ground that no agreement to arbitrate exists, the court "should give to the opposing party the benefit of all reasonable doubts and inferences that may arise." *Id.* (footnote omitted). "A naked assertion . . . by a party to a contract that it did not intend to be bound by the terms thereof is insufficient to place in issue 'the making of the arbitration agreement' for the purposes of Section 4 of the Federal Arbitration Act.: *Id.* at 55. However, "[a]n unequivocal denial that the agreement had been made, accompanied by supporting affidavits, . . . in most cases should be sufficient to require a jury determination on whether there had in fact been a 'meeting of the minds.'" *Id.* (quotation omitted); *see also Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995) (holding that "it is not sufficient for the party opposing arbitration to utter general denials fo the facts on which the right to arbitration depends"); *Manning v. Energy Conversion Devices, Inc.*, 833 F.2d 1096, 1103 (2d Cir. 1987) (holding that "[a] party resisting arbitration on the ground that no agreement to arbitrate exists must submit sufficient evidentiary facts in support of this claim in order to precipitate the trial contemplated by 9 U.S.C. § 4" (citations omitted)).

Under New York law, to form a valid contract "there must be an offer, acceptance, consideration, mutual assent and intent to be bound." *Hodges v. Morrison*, No. CV 08-76, 2010 WL 2922689, \*3 (E.D.N.Y. July 19, 2010) (citations omitted). To determine whether there is mutual assent, the court "'considers whether there has been a meeting of the minds between the parties on all essential terms of the agreement.'" *Id.* (quotation and other citations omitted). A party who alleges that a contract exists must prove not only the existence of the contract but the

contract's terms as well. *See id.* (citation omitted). Therefore, "a contract is formed when the contracting parties express an intent to be bound, and where the essential terms of the agreement have been agreed upon." *Id.* at *4 (citations omitted).

In this case, the agreement itself does not support Respondent's assertion that there was no meeting of the minds regarding the terms of the agreement. The "Purchase Order" provides that the scope of the project is "Delivery of Precast Concrete Deck Slabs Approx. 1,538 loads $1,080.00/load to staging area." *See* Dkt. No. 1-2 at 15. Furthermore, the Purchase Order states that Respondent "shall provide the required trucking/hauling services for the above referenced project at the above referenced price for the duration of the project." *See id.* Although the Purchase Order does provide that the project timeline was still being developed, it provided information for each stage of the project: "Stage 1: Shipping between April and September 2011; Stage 2: Shipping between January and July 2012; Stage 3: Shipping between November 2012 and June 2013." *See id.*

The Purchase Order also provides that, "[d]uring the project, there will be times within each stage where no deliveries will be required to allow for issues on the job such as weather delays, traffic pattern changes, etc. We will need to deal with these incremental breaks as best we can and [Respondent] will not charge additionally for any idle equipment or drivers." *See id.* at 16. The Purchase Order provides further that Respondent may assess a fuel surcharge if the price for diesel exceeds $4.00 per gallon and, likewise, that Respondent would issue a fuel discount if the price for diesel dropped below $2.70 per gallon. *See id.* Finally, the Purchase Order provides that [Respondent] "shall also adhere to the terms and conditions as noted in the 'Standard Shipping Agreement' signed by both [Respondent] and [Petitioner] and attached

-11-

hereto. The attached terms and conditions area part of this purchase order." *See id.*

The attached Standard Shipping Agreement provides that, "[b]y signing this Agreement, [Respondent] agrees to be bound by these terms and conditions." *See id.* at 17. This Standard Shipping Agreement clearly sets forth Petitioner's responsibilities and Respondent's responsibilities. One of Respondent's responsibilities was to

> maintain, at all times, insurance coverage of the types and at the limits outlined in the attached sample insurance certificate. Prior to commencement of any work with [Petitioner], [Respondent] must furnish the insurance certificate to [Petitioner] for review and approval. After furnishing the original certificate, it is [Respondent]'s responsibility to furnish additional certificates upon insurance renewal or at any point [Respondent] changes its insurance coverage. [Petitioner] maintains the right to request insurance evidence at any point. It is [Respondent]'s responsibility to insure its interest in its trailers and equipment and any other personal property brought onto [Petitioner]'s property.

*See id.*

The Standard Shipping Agreement also provides that Respondent

> is responsible for acquiring and paying for all permits required by the various jurisdictions involved with the loads. [Respondent] is responsible for following all guidelines and restrictions associated with the permits and jurisdictions involved. [Respondent] is responsible for acquiring and paying for certified, licensed, and reputable escorts, as required by permit or the jurisdiction(s) to be traveled through.[2]

---

[2] The Court finds it interesting that the Purchase Order/Standard Shipping Agreement incorporated many of the terms of the revised quotation that Respondent had sent to Petitioner and which Respondent appears to be attempting to repudiate. For example, this quotation refers to the same start and end dates for the project. It also includes, under the heading "for duration of the Project" the price of "$1,080.00 per load to staging." The quotation also references the fact that fuel cost is based on $4.00 per gallon and that "any increase in fuel over $4.00 per gallon would need to be reimbursed by [Petitioner]." Under the heading of "trailers," the quotation provides that "[Respondent] will provide the 45 trailers needed for the length of
(continued...)

*See id.*

Although Respondent now asserts that the parties had not agreed on certain material terms, that argument is inconsistent with the agreement that Respondent signed. Respondent signed the Standard Shipping Agreement, which clearly states that by signing it Respondent agreed to be bound by its terms and conditions. If Respondent had concerns about the exact dates on which shipments would be made, it should not have signed the agreement. In its own quotation to Petitioner, Respondent used the term "for the duration of the Project" in quoting $1,080.00 per load to staging. Finally, although Respondent now argues that, "if the size and scope ultimately called for an escort vehicle, route planning, and permitting, the price per load would require adjustment," that is not indicated in its price quotation and, in addition, in the Standard Shipping Agreement, under "Responsibilities of [Respondent] under the Agreement," these items are specifically delineated. *See* Dkt. No. 1-2 at 17.

Based on the overwhelming evidence in the record, the Court concludes that the parties had a meeting of the minds as to the terms of the agreement. Respondent has not submitted any credible evidence to create an issue of fact regarding this issue. Therefore, the Court concludes that a valid contract exists between the parties and grants Petitioner's motion to compel arbitration of the parties' dispute because their dispute is covered by the arbitration clause in that agreement.

---

[2](...continued)
project and will not back charge for any lapse in schedule or weather delays."

### III. CONCLUSION

After reviewing the entire file in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Respondent's motion for an extension of time in which to respond to Petitioner's motion to compel arbitration is **DENIED**; and the Court further

**ORDERS** that Petitioner's motion to compel arbitration is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Petitioner and close this case.

**IT IS SO ORDERED.**

Dated: February 28, 2013
       Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Court Judge